# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-11043

United States Court of Appeals
Fifth Circuit

**FILED**

January 14, 2015

Lyle W. Cayce
Clerk

ABRAHAM & VENEKLASEN JOINT VENTURE;
ABRAHAM EQUINE, INCORPORATED;
JASON ABRAHAM,

Plaintiffs - Appellees

v.

AMERICAN QUARTER HORSE ASSOCIATION,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before JOLLY and JONES, Circuit Judges, and AFRICK*, District Judge.

EDITH H. JONES, Circuit Judge:

Jason Abraham, Abraham Equine, Inc., and Abraham & Veneklasen Joint Venture ("Plaintiffs") filed suit alleging that the American Quarter Horse Association ("AQHA") violated Sections 1 and 2 of the Sherman Act and the Texas Free Enterprise and Antitrust Act.[1] The antitrust allegations stem from votes by the Stud Book and Registration Committee ("SBRC") of the AQHA,

---

\* District Judge of the Eastern District of Louisiana, sitting by designation.

[1] Because the Texas Free Enterprise and Antitrust Act utilizes the same standards as the Sherman Act for establishing a violation, the Sherman Act analysis applies to Plaintiffs' state law claims as well.

No. 13-11043

which had blocked AQHA registration of horses created through somatic cell nuclear transfer ("SCNT"), also known as cloning. At trial, AQHA moved for judgment as a matter of law ("JMOL"), Fed. R. Civ. P. 50(a), which was denied by the district court. AQHA appeals the denial of its motion. We REVERSE the denial of AQHA's motion for Judgment as a Matter of Law and RENDER judgment in favor of AQHA.

## BACKGROUND

The plaintiffs here include Abraham & Veneklasen Joint Venture, a business formed by Jonathan Abraham and Gregg Veneklasen. Abraham is the sole shareholder of Abraham Equine, Inc., which provides recipient mares that act as surrogate mothers for Quarter Horse embryos. Veneklasen is a veterinarian, owner of a veterinary hospital, and an expert in advanced equine reproductive techniques. The two formed Abraham & Veneklasen Joint Venture to invest in shares of multiple Quarter Horses that were produced by cloning top prize winners in racing and cutting horse competitions. Without access to AQHA's breed registry, however, the cloned horses cannot participate in the lucrative racing, breeding or horse shows that are characteristic of the market for "elite Quarter Horses," as defined by Plaintiffs' expert.

Appellant AQHA is a non-profit association with a general membership of more than 280,000 worldwide that was organized in 1940 to collect and register the pedigrees and protect the breed of the American Quarter Horse. In addition to its breed registry, which has listed millions of horses over the years, AQHA sponsors horse shows that attract international patronage, supports educational activities, and sanctions races in which only AQHA-registered horses may compete. Consequently, "[M]eaningful participation in this multimillion dollar industry is dependent upon AQHA membership and AQHA registration." *Hatley v. American Quarter Horse Ass'n*, 552 F.2d 646, 654 (5th Cir. 1977).

2

No. 13-11043

Strategic decisions for the organization are made by the Board of Directors, the five-member Executive Committee, and a variety of standing committees that report to the general membership and the Board. The Board's membership has ranged from about 280–340 during the years in question, and about 99 new Board members joined the Board during the same period. The Stud Book and Registration Committee is one such standing committee. The SBRC comprises about 30 members, with partial annual rotating membership, and its members are selected by the President with the advice and majority vote of the Executive Committee. The SBRC reviews proposed changes to AQHA's equine registration rules and makes recommendations regarding those proposals to the general membership at the annual convention. During the annual meeting, general members are allowed to address the SBRC and observe its discussions. The SBRC's recommendation is then presented to the general membership, which determines whether that recommendation is submitted to the Board for final approval. Only the Board of Directors may change the breed registration rules.

From its inception, AQHA has maintained rules identifying the characteristics required of any horse sought to be registered as an American Quarter Horse, and the organization's registry has maintained records of the offspring of registered American Quarter Horses. Originally, the records consisted essentially of birth certificates for the offspring. As animal reproductive techniques have evolved, however, AQHA registered horses bred by means of artificial insemination and embryo transfers.

Most recently, AQHA approved registration of horses "bred" by Intracytoplasmic Sperm Injection ("ICSI"). ICSI involves the injection of a single sperm cell into a mature unfertilized egg cell called an oocyte. The fertilized egg is then transferred to a recipient mare. The plaintiffs' cloning techniques, known as Somatic Cell Nuclear Transfer ("SCNT"), create animals

3

without distinct sire and dam bloodlines for registry. Instead, each cloned horse is a "twin separated by time" of only one animal and any other clones of that initial donor horse.

At its annual convention in 2003, the AQHA Board adopted Rule 227(a), which declared cloned horses ineligible for AQHA breed registration. Between 2008 and 2013, the AQHA received four requests to change the rule, two of which were made by Plaintiffs. In 2008, the SBRC responded by recommending further study; in 2009 the SBRC recommended the creation of a cloning task force to study the impact and science of cloning; and in 2010 the SBRC recommended a denial of the rule change proposal. Since 2010, the SBRC has recommended retention of the rule, and the Board has accepted that recommendation.[2]

The plaintiffs contend that members of the SBRC and the SBRC conspired with AQHA to prevent cloned horses from being registered as American Quarter Horses and thus excluded their horses from the market for "elite Quarter Horses." Influential members of the SBRC allegedly tainted the committee's deliberations because their personal economic interests would be harmed by competition with cloned horses, especially in breeding and racing. The plaintiffs articulated a plausible motive for anticompetitive activity, but the principal questions on appeal are whether they proved an actual conspiracy to restrain trade in violation of Section 1 of the Sherman Act, or illegal monopolization by AQHA of breed registration for the "elite Quarter Horse" market in violation of Section 2.

Plaintiffs filed suit in April 2012, and their case was tried to a jury. The court denied AQHA's motion for judgment as a matter of law. After sending

---

[2] In 2013, the Board voted to defend the instant litigation, i.e., to defend the anti-clone-registration rule.

No. 13-11043

two notes asking for clarification, the jury found in favor of the plaintiffs but declined to award damages.  To effectuate the verdict, the court entered a sweeping injunction that specified the rule changes AQHA must adopt to permit breed registration of cloned horses.  AQHA has appealed, challenging the sufficiency of evidence for each element of the Sherman Act claims and the scope of the district court's injunction.[3]

## STANDARD OF REVIEW

This court reviews a denial of a motion for judgment as a matter of law de novo.  *Evans v. Ford Motor Co.*, 484 F.3d 329, 334 (5th Cir. 2007).  A motion for JMOL should be granted if the evidence is legally insufficient, such that "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict."  *Boeing v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331, 336 (5th Cir. 1997) (en banc).  The reviewing court must consider the facts in the light most favorable to the verdict.  *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 481 (5th Cir. 2001).

## DISCUSSION

I.     **Section 1 of the Sherman Act.**

As opposed to Section 2 of the Sherman Act, Section 1 is only concerned with concerted conduct among separate economic actors rather than their independent or merely parallel action.  Ultimately, "plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market."  *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996). But not all nominally separate entities are capable of violating Section 1 of the Sherman Act through a conspiracy that

---

[3] We do not reach issues concerning the injunctive relief.

5

restrains trade.  AQHA contends, first, that as a "single entity," it could not conspire with its members or with the SBRC.  Alternatively, AQHA asserts that the evidence of conspiracy is legally insufficient to support the verdict.

### A.     Entities Capable of Conspiring.

As a general rule, Section 1 of the Sherman Act does not apply to single entities.  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190, 130 S. Ct. 2201, 2207 (2010).  The Court reiterated in *American Needle*, however, that "concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities." *Id.* at 191.  Thus, "[a]greements made within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself, and the intra-firm agreements may simply be a formalistic shell for ongoing concerted action." *Id.* at 200.  A functional analysis of the parties' actual participation in the alleged anticompetitive conduct is necessary to draw the inference of illegal concerted action.  Pursuant to this functional approach, a corporation and its officers and employees, or a corporation and its divisions or wholly owned subsidiaries have been held to be a "single entity" that is incapable of concerted action that impairs competition in the marketplace. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767, 104 S. Ct. 2731, 2739 (1984).  Other legal entities, however, when made up of members or entities that may compete with each other, may conspire illegally. *See, e.g.*, *United States v. Sealy, Inc.,* 388 U.S. 350, 352–56, 87 S. Ct. 1847, 1850–52 (1967); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,* 468 U.S. 85, 104 S. Ct. 2948 (1984); *Associated Press v. United States,* 326 U.S. 1, 65 S. Ct. 1416 (1945).  The "key", according to the Court, is whether the "contract, combination…, or conspiracy" joins together "separate decisionmakers," i.e., "separate economic actors pursuing separate economic interests." *Am. Needle,* 560 U.S. at 195, 130 S. Ct. at 2205.  If so, then the

No. 13-11043

agreement may "deprive[] the marketplace of independent centers of decisionmaking[.]" *Id.* at 195, 2212.

Following this explanation, the Court in *American Needle* readily concluded that the joint venture formed by thirty-two NFL teams, "at least" with regard to their decision collectively to license the teams' independently owned intellectual property, was engaged in concerted rather than single entity action and thus potentially violated Section 1. The Court reasoned that apart from the teams' agreement to cooperate in exploiting these assets, they would be competitors in the market to produce and sell team logo wearing apparel and headgear by licensing their intellectual property and dealing with suppliers.

On one hand, the Court held that the justification for the National Football League Properties' ("NFLP") cooperative agreement—the structural necessity of a sports league to produce the "product" of major league football— is irrelevant to whether there was concerted or independent action at the threshold of Section 1 analysis. *Am. Needle*, 560 U.S. at 199, 130 S. Ct. at 2214. On the other hand, however, the Court recognized that because restraints on competition like those embodied in sports leagues or joint ventures are necessary to make a product available at all, the rule of reason rather than per se rules determines the ultimate question of antitrust violations. *Id.* at 203.

*American Needle*'s rejection of "single entity" status for organizations with "separate economic actors" does not fit comfortably with the facts before us. AQHA is more than a sports league, it is not a trade association, and its quarter million members are involved in ranching, horse training, pleasure riding and many other activities besides the "elite Quarter Horse" market. The plaintiff's expert claimed that no more than .5% of the yearlings sold each year fall within the plaintiffs' proposed sub-market of AQHA-registered elite Quarter Horses. Under such circumstances, it is difficult to draw the

7

conclusion that because a tiny number of economic actors within AQHA may "pursue their separate economic interests," the organization has conspired with that minority. *American Needle*, in contrast, involved membership all of whom owned and profited from the exclusive licensing arrangements entered into by the NFLP joint venture. Similarly, in the other cases cited by the Court in *American Needle*, the organizations found capable of conspiring with members who were "independent decisionmakers" were trade groups or competitor groups all of whose members directly profited from the exclusionary conduct. In *American Needle*, the Court's description of potentially illegal conspiracies involving such organizations is laden with adjectives referring to the members' independent economic interests. *Am. Needle*, 560 U.S. at 196–97, 130 S. Ct. at 2212–13 (describing members of the NFLP as "independently managed business[es]" and "competing suppliers of valuable trademarks"). Here, there is no such unity of interest among over a quarter million members.

Other features appear to distinguish this case from *American Needle*. First, no other case has yet held that an animal breed registry organization can violate the antitrust laws by passing on the qualifications for the breed itself. This court in *Hatley* rejected an antitrust conspiracy claim against AQHA where a horse of undisputed "elite" lineage was denied registration because it had white markings above the permissible places on its legs. *Hatley v. Am. Quarter Horse Ass'n*, 552 F.2d 646, 654 (5th Cir. 1977). Whenever an organization devoted to the preservation of an animal breed revises its standards, exclusion from the relevant "market" will occur. *See, e.g., Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005) (affirming dismissal where organization devoted to those dogs elected not to register dogs that were jointly registered with the American Kennel Club); *Jessup v. Am. Kennel Club, Inc.*, 61 F. Supp. 2d 5 (S.D.N.Y. 1999), *aff'd. on dist. ct. op.,* 210 F.3d 111 (2d Cir. 2000) (granting summary

judgment against claims that Labrador dog breed standards were changed in conspiracy to restrain trade or monopolize).  Perhaps setting the standards for a breed is relevant under *American Needle* to rule of reason analysis after the possibility of concerted action has been admitted.  If so, then breed standards for these volunteer groups should often be immune from antitrust scrutiny because they are essential to "creating the product."

That the organization's purpose is to preserve and enhance the breed's characteristics creates further tension with *American Needle*'s paradigm of a "firm" and "separate economic actors" within the firm whose economic interests diverge from those of the firm.  Contrary to the plaintiffs' assertions, AQHA is not narrowly interested in "having more members and more registered horses." If that premise were true, AQHA would not insist on maintaining pure bloodlines and might elect to register the offspring of horses cross-bred with pure Quarter Horses, if the offspring otherwise complied with Quarter Horse characteristics.  Alternatively, AQHA's enforcement of its "white rule," which denied registration to Hatley's horse, might have been loosened.  *See Hatley*, 552 F.2d at 646.    From this standpoint, AQHA's self-interest as an organization is not limited to profit.   The district court recognized the fallacy in the plaintiffs' reasoning when it concluded that, "It is unclear…whether the AQHA would benefit or be harmed by allowing clone registration."  *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, No. 2:12-CV-103-J, 2013 WL 2297104, at *3 (N.D. Tex. May 24, 2013).  Thus, the divergence of interests between AQHA and the alleged conspirators, which *American Needle* posits, is not clear.

Moreover, an issue not plumbed in *American Needle* is how to assess the organization's ability to conspire with its members given different types of legal structures.  In the NFLP, apparently all the member teams had to agree on the exclusive licensing arrangement, and all the teams owned intellectual

property subject to the agreement; there was thus unity of purpose and decisionmaking by the interested economic actors. AQHA, however, makes policy through a Board of Directors with around 300 annually rotating members. The SBRC proposes action on registration rules, but it cannot unilaterally dispose of the issue. Any AQHA member may propose a rule to the Board during its annual meeting. A functional analysis of an organization's ability to conspire with legally distinct members ought to take these facts into account. It is not clear whether *American Needle* applies on a more abstract plane that covers any organization with actors who have separate economic interests. *See, e.g.*, *Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 285–86 (4th Cir. 2012) (refusing to dismiss Section 1 claim against MLS composed of separate real estate brokerages that were potential competitors). AQHA, however, urges the Court's emphasis on the *pursuit* of separate economic interests as a cornerstone of its argument that the majority of SBRC members' personal interests were not furthered by the anti-cloning rule.

Given these troubling distinctions, we need not resolve in this opinion the scope of *American Needle* for animal breed registry organizations. Instead, we will assume *arguendo* that AQHA was legally capable of conspiring with members of the SBRC in violation of Section 1. The judgment must be reversed, however, for insufficient evidence of a conspiracy.[4]

---

[4] The Court was careful to note that being capable of a Section 1 violation through conspiracy was not the same as proving the existence of a conspiracy or that conspiracy's effect on trade. Indeed, the Court explained that the rule of reason should be applied, ensuring that many entities capable of conspiring would not be ultimately found liable. *Am. Needle*, 560 U.S. at 203.

No. 13-11043

## B.    Evidence of a Conspiracy.

To prove a conspiracy in restraint of trade, the Plaintiff must show some kind of "common design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S. Ct. 1125 (1946); *see also Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S. Ct. 1464, 1469 (1984). If direct evidence is unavailable and the plaintiff relies on circumstantial evidence, the "antitrust plaintiff must present evidence tending to exclude the possibility of independent conduct." *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763 (5th Cir. 2002) (citing *Monsanto*, 465 U.S. at 768). Ultimately, any conduct that is "as consistent with permissible competition as with illegal conspiracy" cannot support a conspiracy inference. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S. Ct. 1348, 1356 (1986).

Plaintiffs here introduced only circumstantial evidence to prove their theory that certain SBRC members, acting to advance their economic interests, controlled the SBRC, and the Board deferred to them, resulting in a conspiracy with AQHA to exclude the plaintiffs' cloned horses from the elite Quarter Horse market. Whether taken individually or as a whole, the evidence does not raise a substantial issue of conspiratorial activity. In Plaintiffs' appellate brief, a single page is labeled "Evidence: Agreements with and within the SBRC." Plaintiffs there contend that trial testimony "reinforced" the existence of an agreement and provide a string citation to the record without any explanation of the testimony. The testimony captured by the string citation contains three types of evidence: (1) some SBRC members, who own, race, show and/or breed elite Quarter Horses, stand to benefit personally from retaining the ban on clones; (2) those members were "influential"; and (3) such influential members spoke vociferously against cloning at SBRC meetings. In its statement of the case, Plaintiffs' brief also references (1) an alleged concession by a former

11

AQHA president that there was an "agreement" within SBRC to prevent clones from being registered; (2) meeting notes concerning the "strategy" to defeat registration; (3) and "sham" procedures over the course of four years while AQHA discussed and debated registration of cloned horses.[5] Despite Plaintiffs' provocative descriptions, the evidence of a conspiracy to control the SBRC and AQHA is lacking.

The first category of evidence in the string citation—some members of the SBRC stand to gain financially from the clone ban—proved less than Plaintiffs would like. At trial, plaintiff Jason Abraham testified that twenty members of the SBRC bred some type of Quarter Horse or were influential in breeding circles.[6] Abraham, however, acknowledged he did not know about their status as elite breeders. Plaintiff Veneklasen made the same assertion about twenty elite breeders on the SBRC, but he had to change his testimony after being confronted with the membership list. He admitted that the list showed only four or five members of the SBRC who remained active in horse breeding, while the other individuals had either retired or had never participated as breeders in the elite Quarter Horse market. AQHA witness Jeff Tebow, a member of the SBRC, testified that a few of the SBRC members had made a substantial amount of money from the industry and a few of them supported themselves by horse breeding. Tebow referred to these individuals

---

[5] Curiously, Plaintiffs' string citation also contains a reference to testimony that the SBRC meetings on the science of cloning had fairly presented both sides of the issue. This evidence seems to cut against Plaintiffs' burden of providing evidence that tends to rule out independent action.

[6] It should be noted that Plaintiff argues that a majority of SBRC members are breeders who stand to gain from the restraint of trade, even though many of those breeders do not participate in the "elite Quarter Horse market" upon which Plaintiffs base their claim. We do not address the market issue—as this case is resolved under the conspiracy issue—but Plaintiff's admission that non elite Quarter Horse breeders are impacted by cloning bans would have to play some role in determining whether Plaintiff's "elite Quarter Horse market" is a distinct market that actually exists.

as "the leaders of our industry." SBRC member Butch Wise also testified that quite a few committee members "had some skin in the game" as breeders, but he did not distinguish between breeders of elite and non-elite horses. Wise later testified that it was common for committee members to sell horses for one another, use a common brokerage firm, and breed horses with one another's stock. The picture that emerges from the testimony and relationship diagram offered by Plaintiffs is that of a committee some of whose members have been financially successful in aspects of Quarter Horse business and some of whom have had extensive, fruitful outside business relationships with each other. This evidence is relevant to the "separate economic interests" test for determining whether a single entity is *capable* of a conspiracy, but more than the existence of the financial interests of a few is required to prove a conspiratorial agreement among them.

Since Plaintiffs rely on circumstantial evidence, they must show that circumstantial evidence both supports an inference of conspiracy and tends to exclude independent conduct. *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763 (5th Cir. 2002). Any conduct that is "as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S. Ct. 1348, 1356 (1986). It is here critical to note that the SBRC, whose membership altered each year, included about thirty members annually during the relevant period, but only a handful of them were identified by Plaintiffs as profiting in the elite Quarter Horse market. Yet there was a conspicuous lack of evidence concerning the dozens of committee members not financially involved in the elite Quarter Horse market. Whatever the motivations of the breeders who were singled out by Plaintiffs, they were outnumbered in voting strength by the others who were not shown to have such financial interests. Moreover, trial testimony established that SBRC

members had ethical concerns about cloning in addition to practical concerns about verifying parentage to maintain the integrity of the registry.   At best, the evidence showed that only a vocal minority of SBRC members both opposed cloning and had financial interests that could be injured by registration of cloned elite Quarter Horses.

The second category of testimony contained in Plaintiff's string citation is the alleged disproportionate influence of certain SBRC members, but that, too, cannot support an inference of conspiracy.   Plaintiff Gregg Veneklasen's trial testimony labeled a few members of the SBRC as a "good ol' boys club," based on each member's financial success in racing or breeding Quarter Horses.   But aside from hollow labels, Plaintiffs have no evidence that any such sub-group exerted a disproportionate influence to affect vote outcomes within the SBRC or the Board.   And even if this "boys club" existed to exert influence generally, the only evidence that its members made any kind of agreement to oppose cloning amounts to no more than innuendo.

The third category of testimony contained in the string citation—an AQHA member made unfavorable statements at an SBRC meeting—also fails to support an inference of a conspiracy.   In addition to an agreement among the members of the committee, Plaintiffs allege a conspiracy between the committee and AQHA.   To support this theory of an agreement between the AQHA and SBRC, Plaintiffs introduced the testimony of Robert "Blake" Russell, the President of ViaGen L.C., the laboratory which conducts business with Plaintiffs.   Russell testified that he attended the 2009 AQHA convention and the corresponding SBRC meeting that was addressed by AQHA Executive Committee Member John Andreini.   Russell testified that Andreini's impassioned speech against registering clones included the statement, "I will not allow this technology to move forward. I will not have sixty First Down Dashes [a legendarily successful racing Quarter Horse] in every county in this

country. And I have put millions of dollars in this industry, and if this is approved, I will take every dime of it out." Russell testified that he believed Andreini was concerned with the competitive effects of lifting the clone ban. AQHA registered clones would be able to compete in lucrative races and take part in the breeding market. Russell believed Andreini did not want to face "sixty First Down Dashes" in competition. Assuming arguendo that Andreini was attempting to restrain competition, the record is devoid of any evidence regarding SBRC member reactions to Andreini. Did they respond favorably or negatively? Were they, in any way, influenced by his speech? Was it given any weight? Without more, Andreini's impassioned speech is simply a one-sided complaint about cloning.

This court has already rejected the inferential value of one-sided complaints in *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758 (5th Cir. 2002). In *Viazis*, an orthodontic devices manufacturer contracted with a dentist to manufacture and advertise a product that the dentist had invented and patented. When the dentist aggressively advertised the product himself, the American Association of Orthodontists ("AAO") complained of the dentist's behavior to the manufacturer. The complaints were coupled with veiled threats of a boycott. This court held that the evidence of AAO complaints to the manufacturer was insufficient to infer the second party's intent to enter into a conspiracy. With circumstantial evidence, this court noted, the plaintiff must present evidence that tends to exclude the possibility of the manufacturer's independent conduct. Since one-sided complaints could not exclude the possibility of independent action, the manufacturer's actions were as consistent with legal conduct as with conspiratorial conduct, making the evidence insufficient to support a finding of conspiracy.

Andreini's one-sided complaints are factually indistinguishable from *Viazis*. An agreement requires a meeting of the minds. Like the AAO

complaints in *Viazis*, the only evidence here is a one-sided complaint without any hint of a favorable response from the alleged co-conspirator, the SBRC. Only half of the equation is present. And a one-sided complaint is just not a suitable basis for an inference of conspiracy. Even Andreini's threat to pull his money from the industry cannot distinguish this case from a typical one-sided complaint. The AAO in *Viazis* also threatened monetary retaliation in the form of a boycott of the manufacturer. And just like the threat of boycott in *Viazis*, Plaintiffs would have to show some additional evidence that the SBRC responded to that economic threat with some action. *Viazis*, 314 F.3d at 763. Therefore, no inference of a conspiracy can be drawn from Andreini's one-side complaint.[7]

In addition to the evidence referenced in the string citation, Plaintiffs' statement of facts alluded to other evidence they consider incriminating. They reference testimony of Frank Merrill, a former AQHA president and sometime SBRC member who was outspokenly opposed to registering cloned horses. Merrill, they contend, admitted that the SBRC "agreed to exclude" cloned horses. This is a mischaracterization. Merrill was referring not to a conspiratorial agreement, but only to the thirty-member committee's official votes on the subject. *Cf. Tunica Web Advertising v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 410 (5th Cir. 2007) (evidence of emails referencing "gentleman's agreement" among competitors sufficient to create fact issue of conspiracy).

Plaintiffs accuse the AQHA and SBRC of "sham procedures" designed to defeat registration of cloned horses. They refer to a "secret meeting" in

---

[7] If the plaintiffs intended to use Andreini's speech as indicative of one-sided complaints made by other AQHA members, e.g., Frank Merrill, their brief does not say so. However, mere complaints, without proof of an agreement to exclude cloned horses from registration, are insufficiently probative of concerted, as opposed to independent action by the SBRC or its members.

No. 13-11043

January 2012 that, behind the back of AQHA's then president, lay the groundwork for SBRC's official rejection of registration for clones. The only evidence of a meeting in January 2012, however, is an email *from* the president inviting certain SBRC members to an official meeting of AQHA's Executive Committee meeting to discuss cloning. There was nothing secret about it. Even more telling, there is no testimony about what transpired at the not-so-secret meeting.

Plaintiffs contend that AQHA "stacked" the SBRC with hand-selected industry leaders with interests in conflict with cloning. As has been noted, the committee was never shown to have a voting majority of members with interests in elite Quarter Horses, although most of its members, unsurprisingly, have been breeders of Quarter Horses. In any event, Plaintiffs failed to explain why the selection of SBRC members was not as consistent with permissible activity as it was with impermissible activity; selecting industry leaders who are knowledgeable about breeding for a committee focused on registration of the breed seems quite reasonable. In regard to Plaintiffs' more general challenges to SBRC's procedures, its relation to decisionmaking by the Board, and its conduct of the cloning task force, Plaintiffs offered nothing more than pejoratives without evidence that the deliberative processes in place deviated from AQHA's standard procedures or failed to offer the plaintiffs an opportunity to make their case for registering cloned horses. As one court explained, "[T]he antitrust laws are not intended as a device to review the details of parliamentary procedure." *Jessup v. American Kennel Club Inc.*, 61 F.Supp. 2d 5, 12 (S.D.N.Y. 1999), *aff'd on dist. ct. op.*, 210 F.3d 111 (2d.Cir. 2000). Plaintiffs did not produce evidence tending to exclude the possibility of a decision arrived at by independent, not illegally concerted action.

17

No. 13-11043

Finally, the plaintiffs focus on a "plan" to delay and ultimately reject cloned horse registration that allegedly appeared in the handwritten notes of AQHA's executive director Don Treadway. The eight pages of random, scrawled notes span nearly two years and derive from various meetings and conversations. While they reveal Treadway's thinking and concerns others expressed about cloning and AQHA's possible reaction to it, they contain no "smoking gun" referencing any agreement within AQHA or its membership to restrain the market for elite Quarter Horses.

Reasonable jurors, in sum, could not draw any inference of conspiracy from the evidence presented, because it neither tends to exclude the possibility of independent action nor does it suggest the existence of any conspiracy at all. In the absence of substantial evidence on the issue of an illegal conspiracy to restrain trade, AQHA's JMOL motion should have been granted.

## II.    Section 2 of the Sherman Act

Because Plaintiffs' conspiracy claim is unsustainable as a matter of law, we must consider the alternative verdict that AQHA as a single entity is liable for illegal monopolization under Section 2 of the Sherman Act. "A violation of section 2 of the Sherman Act is made out when it is shown that the asserted violator 1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999). Having or acquiring a monopoly is not in and of itself illegal. The illegal abuse of power occurs when the monopolist exercises its power to control prices or exclude competitors from the relevant market for its products. *See, e.g., United States v. E.I. DuPont de Nemours*, 351 U.S. 377, 391–94, 76 S. Ct. 994, 1005–06 (1956) (discussing

18

No. 13-11043

Section 2 illegal monopoly power in terms of the potential competitors for the monopolist's product).

Plaintiffs here contend that AQHA monopolized the relevant market for elite Quarter Horses.  Assuming arguendo that this is a cognizable relevant market, it is true that AQHA's breed registry rules admit or exclude horses from that market.  Nothing in the record, however, shows that AQHA competes in the elite Quarter Horse Market.  AQHA is a member organization; it is not engaged in breeding, racing, selling or showing elite Quarter Horses.  AQHA was entitled to JMOL because it neither enjoyed nor was attempting to enjoy monopoly power in the elite Quarter Horse market.  *Beard v. Parkview Hosp.*, 912 F.2d 138, 144 (6th Cir. 1990) (defendant hospital that signed exclusive radiological services contract could not "monopolize" the radiological services market in which it did not compete).

According to the plaintiffs, competition in the monopolized relevant market is not a requirement of Section 2.  This is incorrect.  The only two cases they cite are inapposite or distinguishable.  One case alleged a group boycott violating Section 1 of the Sherman Act with no claim of a Section 2 abuse of monopoly power.  *Tunica Web Adver.*, 496 F.3d at 409; *see also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481, 112 S. Ct. 2072, 2090 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").  In the other case relied on by Plaintiffs, an archery manufacturers and distributors trade association that put on an archery trade show acted in concert with association members to drive out of business its only competitor in the market for archery trade shows.  *Full Draw Prods. v. Easton Sports Inc.,* 182 F.3d 745 (10th Cir. 1999). The trade association competed directly in the monopolized market, and a motion to dismiss was accordingly reversed.  In contrast to *Full Draw*, the Section 2 claim made in

No. 13-11043

this case challenges only the conduct of AQHA (not concerted monopolization activity), and AQHA is not a competitor of the plaintiffs.

Finally, as case law demonstrates, the essential attributes of illegal monopoly power are judged by the monopolist's participation in the relevant market. *See, e.g.*, *American Tobacco Co. v. U.S.*, 328 U.S. 781, 809, 66 S. Ct. 1125 (1946) (defining monopoly power as the power to "exclude actual or potential competition from the field"); *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964, 981 (5th Cir. 1977) ("Such a share of the relevant market is sufficient to establish a monopoly power."); *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 594 (7th Cir. 2008) ("Monopoly power we know is a seller's ability to charge a price above the competitive level (roughly speaking, above cost, including the cost of capital) without losing so many sales to existing competitors or new entrants as to make the price increase unprofitable.")(emphasis omitted). The ability to extract above-market profits from raised prices, the possession of large market share, and the ability to exclude one's competitors are all factors that could only apply to a party who participates in the relevant market that has been monopolized.

Consequently, the Section 2 claim failed as a matter of law because AQHA is not a competitor in the allegedly relevant market for elite Quarter Horses.

## CONCLUSION

For these reasons, we **REVERSE** and **RENDER** judgment for the Appellant.

20