# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 19, 2022

Lyle W. Cayce
Clerk

No. 21-30622

BRFHH Shreveport, LLC, *doing business as* University Health Shreveport,

*Plaintiff—Appellant*,

*versus*

Willis-Knighton Medical Center, *doing business as* Willis-Knighton Health System,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:20-cv-142

---

Before Smith, Duncan, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

BRFHH Shreveport sued Willis-Knighton Medical Center for antitrust violations. The district court dismissed the complaint for failure to state a claim. We affirm.

No. 21-30622

I.

A.

We "accept all well-pleaded facts as true and view them in the light most favorable to the non-movant." *Turner v. Lieutenant Driver*, 848 F.3d 678, 684 (5th Cir. 2017). Here, that's BRFHH Shreveport ("BRF").

We begin by describing the three main players. First is Louisiana State University's medical school in Shreveport, known as "LSU Health Shreveport" or "LSU" for short. LSU long owned and, until 2013, operated a clinical teaching hospital in Shreveport. That hospital was one of six in the city.

Second is BRF. In 2013, LSU hired BRF to operate its Shreveport hospital (along with a separate hospital in Monroe). The hospital then became known as University Health Shreveport ("UHS").[1] BRF ran UHS until 2018, at which point another medical company, Ochsner, took its place. Since 2018, an entity jointly owned by LSU and Ochsner has managed the hospital.

Third is Willis-Knighton Medical Center. Willis-Knighton was the largest provider of medical care in the Shreveport area, and it controlled four of the city's six hospitals. It enjoyed a concomitantly large portion of the market share for commercially insured patients. Willis-Knighton regularly made charitable donations to LSU, and LSU depended heavily on those donations.

---

[1] BRF often refers to itself as UHS, which can be confusing. Throughout most of this opinion, the distinction between UHS and BRF isn't important. So we generally use the term "BRF" to refer to both BRF itself and to UHS while under BRF's management. We use the term "UHS" only when the distinction between the hospital and its (former) managing company makes a difference.

2

Less than two years into the BRF/LSU collaboration, the relationship soured. That gave rise to a spate of litigation separate from, but relevant to, the current lawsuit. First, LSU issued a notice of breach to BRF in 2015. *See* Petition for Declaratory Judgment and Injunction at 96, *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, No. 5:15-cv-2057 (W.D. La. Sept. 28, 2015), ECF No. 77-1 (copy of the July 10, 2015 breach notice, attached as part of a docket entry in the first antitrust suit); *Lake Eugenie Land & Dev., Inc. v. Halliburton Energy Servs. (In re Deepwater Horizon)*, 934 F.3d 434, 440 (5th Cir. 2019) ("We may take judicial notice of prior court proceedings as matters of public record."). Second, BRF sued Willis-Knighton (but not LSU) in July 2015 for antitrust violations. *See* Complaint, *BRFHH Shreveport*, No. 5:15-cv-2057 (W.D. La. July 16, 2015), ECF No. 1. It alleged that Willis-Knighton and LSU made an illegal agreement, wherein LSU would direct its physicians to steer commercially insured patients to Willis-Knighton. Third, LSU filed a state-court lawsuit against BRF. *See* Petition for Declaratory Judgment and Injunction, *supra* (LSU's initial state-court pleading, attached as a docket entry in the first antitrust suit). LSU alleged that BRF had breached its obligations in various ways and sought to end BRF's management of UHS.

The way BRF tells the story, its 2013 takeover of UHS was massively successful. The hospital had been poorly run and inefficient, but BRF turned things around completely. BRF cut expenses, decreased wait times, increased the quality of care, and so on. Willis-Knighton looked on with envy.

Willis-Knighton began to worry that BRF would threaten its power in the Shreveport healthcare market. Willis-Knighton enjoyed a market share of 75% of commercially insured patients and controlled 80% of primary care physicians during the relevant times. Willis-Knighton's internal documents said that the insurer "Blue Cross [Blue Shield] told another hospital system there is only one health care system they must have in Louisiana: Willis-

Knighton." Willis-Knighton's then-CEO even boasted about the company's market power in a 2013 book. On his telling, a significant portion of Willis-Knighton's profits came from its dominant position in the Shreveport healthcare market.

In the spring of 2016, LSU found itself in a budget crisis. It had been running at a deficit of $40 million to $50 million each year since BRF's 2013 takeover of UHS. In 2016, that deficit combined with Louisiana's broader budgetary problems to create at least the perception (and presumably the reality) that LSU desperately needed more money. LSU asked BRF for a $100 million donation to help close the gap, but BRF couldn't muster the funds.

LSU's crisis and BRF's inability to help gave Willis-Knighton an opportunity. Willis-Knighton decided to take advantage of LSU's situation by conditioning cash donations on LSU's behavior. The alleged approach was carrot-and-stick. The carrot: Willis-Knighton tentatively agreed to give LSU a $50 million donation if LSU backed off on its cooperation with BRF. The stick: Willis-Knighton hinted on several occasions that, if LSU didn't comply, Willis-Knighton would cut off donations.

BRF suggests Willis-Knighton experienced competitive pressure in the Shreveport market as early as 2014. But the complaint plainly alleges that it was not until 2016 that Willis-Knighton made the relevant anticompetitive threats. That's because, even though Willis-Knighton presumably wanted to destroy BRF before then, Willis-Knighton wasn't able to effectively pressure LSU with money until the 2016 budget crisis hit.

LSU subsequently did what Willis-Knighton wanted. The complaint isn't clear as to whether LSU *decreased* its existing cooperative activities with BRF or merely refused BRF's offers to *increase* cooperation. In any event, the complaint does allege specific refusals to cooperate.

BRF then alleges that LSU's non-cooperation harmed it in various ways. The basic idea is that cooperation from LSU would have allowed BRF to decrease costs, provide better care to patients, charge patients and insurers less, gain market share, and generally outcompete Willis-Knighton. *See infra*, Part II.B.2 (discussing these allegations in more depth).

BRF and LSU parted ways in 2018 when Ochsner took over management of LSU's Shreveport hospital (and the Monroe hospital, for that matter). The Ochsner relationship improved LSU's financial position, and BRF notes that LSU now cooperates with Ochsner in ways it refused to do with BRF. BRF says this shows that, once LSU was no longer strapped for cash, Willis-Knighton's coercive influence faded away.

B.

BRF brought this antitrust suit in federal court. As in its first suit, BRF named Willis-Knighton but not LSU as a defendant. The complaint alleges that Willis-Knighton entered a conspiracy in restraint of trade, in violation of Section 1 of the Sherman Antitrust Act. *See* 15 U.S.C. § 1. It also alleges that Willis-Knighton committed both actual and attempted monopolization, in violation of Section 2 of the Act. *See* 15 U.S.C. § 2.

Willis-Knighton raised four arguments in a motion to dismiss. First, BRF hadn't alleged antitrust injury, which is a component of antitrust standing. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). Second, BRF failed to state a plausible Section 1 claim. Third, likewise for Section 2. And fourth, the *Noerr-Pennington* doctrine barred BRF's claims. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

The district court dismissed BRF's claims. The court held BRF plausibly alleged an antitrust injury. But for the Section 1 claim, BRF failed to allege an agreement—a fatal defect. As for the Section 2 claim, BRF failed

to allege anticompetitive conduct. Thus, even though Willis-Knighton didn't contest its status as a monopolist, the Section 2 claim failed as well. With both claims gone, the court saw no need to rule on the *Noerr-Pennington* issue and declined to do so. BRF timely appealed.

## II.

We review a district court's grant of a 12(b)(6) motion *de novo. Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020). A complaint cannot survive a motion to dismiss by stating facts "merely consistent with" liability. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). The complaint must instead state "a plausible claim for relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). We accept all well-pleaded facts as true and construe the facts in the light most favorable to the non-movant. *Turner*, 848 F.3d at 684. But we don't accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010) (quotation omitted).

We hold (A) BRF's Section 1 claim fails because BRF hasn't plausibly alleged an agreement between Willis-Knighton and LSU. Then we hold (B) BRF's Section 2 claim fails because BRF hasn't plausibly alleged market foreclosure. That's enough for affirmance, so we don't reach antitrust injury or *Noerr-Pennington. See McCormack v. NCAA*, 845 F.2d 1338, 1343 (5th Cir. 1988) ("Whether a plaintiff has antitrust standing does not raise a question of jurisdiction on which we are required without exception to satisfy ourselves."); *Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022) (differentiating antitrust standing from Article III standing).

## A.

Section 1 of the Sherman Antitrust Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign

nations." 15 U.S.C. § 1; *see also id.* § 15(a) (Clayton Act provision creating a private cause of action for "any person who shall be injured in his business or property" by antitrust violations, including violations of Section 1). To establish a Section 1 violation, "a plaintiff must show that the defendant[] (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *MM Steel, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015) (quotation omitted); *see also Golden Bridge Tech., Inc. v. Motorola, Inc.* 547 F.3d 266, 271 (5th Cir. 2008) (providing the same rule statement and elaborating).

Only the first element is relevant here. It's beyond doubt that a conspiracy (or simply an "agreement"—we use the two interchangeably unless otherwise noted) is a necessary condition for Section 1 liability. That's because Section 1 "does not prohibit all unreasonable restraints of trade[,] but only restraints effected by a contract, combination, or conspiracy." *Twombly*, 550 U.S. at 553 (quotation omitted); *see also ibid.* (explaining that "independent decision[s]" aren't actionable under Section 1 (quotation omitted)); *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 373–74 (5th Cir. 2014) (similar). Notably, though, tacit agreements are still agreements. *See Twombly*, 550 U.S. at 553 ("[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision *or from an agreement, tacit or express*." (emphasis added) (quotation omitted)).

Threat and accession is one way to form a tacit agreement. In *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), the Supreme Court held that evidence of *A*'s threat to *B*, coupled with *B*'s subsequent buckling to the pressure, could constitute "substantial direct evidence" of an agreement for Section 1 purposes. *Id.* at 765 (emphasis omitted); *see also ibid.* ("Evidence of this kind plainly is relevant and persuasive as to a meeting of minds."). Our court has since elaborated on this threat-and-accession theory. *E.g.*, *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215,

220–22 (5th Cir. 2001); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 331–33 (5th Cir. 2015); *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763–64 (5th Cir. 2002); *MM Steel*, 806 F.3d at 844–45. We have always been clear, however, that a threat itself is not enough: *A*'s threat can give rise to an agreement with *B* only if *B* actually gives in and does what *A* wants—and only if *B* gives in *because of A*'s threat. *See, e.g.*, *Viazis*, 314 F.3d at 764.

To our knowledge, this is the first time our circuit has confronted a threat-and-accession case at the 12(b)(6) stage. So we'll pause here to fit the pieces together. A plaintiff proceeding on a threat-and-accession theory must plausibly allege three things: first, that *A* made a threat; second, that *B* subsequently did what *A* wanted; and third, that *B* did so because of *A*'s threat. That third requirement is often the hardest to satisfy. It's not enough to allege that *B*'s behavior was "merely consistent with" caving to the threat. *See Twombly*, 550 U.S. at 557. The plaintiff must do more, providing "allegations plausibly suggesting" that *B* acted in response to the threat rather than out of its own self-interest. *See ibid.*; *Viazis*, 314 F.3d at 764 (affirming a district court's grant of judgment as a matter of law on the ground that the plaintiff hadn't shown the defendant acted "in response to [the relevant] threats" rather than "based on an independent evaluation of its best interests" after "ignor[ing] the threats"); *Abraham & Veneklasen*, 776 F.3d at 333 (similar).

BRF first alleges that Willis-Knighton threatened LSU. The complaint says Willis-Knighton viewed BRF as a dangerous competitor in the Shreveport healthcare market. Willis-Knighton responded by implementing a scheme in 2016 to push BRF out of that market. Willis-Knighton knew about LSU's budget crisis and BRF's inability to give LSU the needed donations, so it stepped into the breach and offered $50 million in donations. But that money came at a price: Willis-Knighton made clear, in various ways,

8

that it would donate the $50 million *only if* LSU refused to cooperate with BRF and instead increased its cooperation with Willis-Knighton.

BRF next alleges that LSU subsequently did what Willis-Knighton wanted it to do: It cut back on its preexisting cooperation with BRF, refused to undertake new cooperative projects with it, and pivoted towards Willis-Knighton instead. For example, LSU rejected a Blue Cross Blue Shield proposal to include BRF in a care network that would've competed with Willis-Knighton. LSU refused to combine fixed costs like housekeeping with BRF. LSU refused to collaborate with BRF to improve physician productivity. LSU fired a neurosurgeon for working with BRF and failing to send enough patients to Willis-Knighton facilities. And LSU refused to let BRF hire its physicians unless BRF paid an above-market rate. That mattered because LSU's by-laws stipulated that only LSU physicians could practice at UHS. The complaint includes other allegations to this effect, but we needn't recount them all here.

Even if we assume that BRF plausibly alleged those first two parts of a threat-and-accession agreement, BRF still loses on the third.[2] Per BRF's

---

[2] BRF's complaint also contains allegations about Dr. Ghali Ghali, who was appointed as LSU's chancellor in 2016. BRF says Ghali was unqualified for the job and functioned as Willis-Knighton's "agent," undermining BRF and responding to Willis-Knighton's whims.

Because we assume for the sake of argument that BRF plausibly alleged non-cooperation from LSU, and because Ghali's alleged actions were merely means to the end of non-cooperation, we need not evaluate the plausibility of these allegations. To the extent BRF suggests that Ghali's appointment somehow *independently* establishes an agreement between Willis-Knighton and LSU, we reject the suggestion as an "unwarranted factual inference[]." *Great Lakes Dredge & Dock*, 624 F.3d at 210 (quotation omitted). BRF tries to avoid this result by rewriting its complaint on appeal. Its brief says Willis-Knighton "assert[ed] that it was willing to donate funds to [LSU] only if a person it approved was appointed as LSU's chancellor." But that's not what the complaint says. The complaint

own complaint, Willis-Knighton's coercion would have been impossible without LSU's recognition that it was in a budget crisis. No crisis, no desperation for cash, no need to give in to threats, no problem. In the complaint's words, Willis-Knighton's campaign "arose in particular as a result of [LSU's] perception of a 'crisis' reflecting a heightened need for additional funds." Further, the complaint says Ochsner's 2018 joint venture and the associated $40 million funding increase to LSU annually "eliminated the source of Willis-Knighton's coercion over LSU." Yet the complaint *also* makes clear that the budget crisis (or at least LSU's awareness of it) didn't happen until 2016—and hence the coercion could not have started before then.[3]

The problem is that LSU had a completely independent reason for refusing to cooperate with BRF, which *predated* any alleged coercion by Willis-Knighton. Specifically, LSU issued a notice of breach to BRF *in 2015*—the year before LSU's cash crunch and Willis-Knighton's alleged coercion. *See* Petition for Declaratory Judgment and Injunction, *supra*, at 96 (copy of the breach notice, attached as a docket entry in the first antitrust suit). And LSU filed suit against BRF shortly thereafter in Louisiana state

---

merely says Willis-Knighton refused to donate until (a) it knew who the next chancellor would be, and (b) it knew LSU was going to cooperate more than it had in the past.

[3] For this reason, it doesn't matter that the complaint contains scattered mentions of Willis-Knighton's pre-2016 behavior. That includes, for example, an allegation that Willis-Knighton's funding strategy was a "longstanding position" and that, in 2012 and 2013, Willis-Knighton's CEO "stated to the Willis-Knighton Board that Willis-Knighton would only continue its current level of funding to LSU 'provided that [Willis-Knighton] and LSU Health remain partners, not competitors.'" It also includes an allegation that Willis-Knighton told LSU's then-dean in 2015 that, if he attended a meeting with BRF, Willis-Knighton would stop funding LSU.

The complaint is clear that any such moves wouldn't have a meaningfully coercive effect on LSU in the absence of a budget crisis. We take the complaint at its word.

court. *See id.* at 1–45 (LSU's initial state-court pleading, attached in the same docket entry). In its initial state-court pleading, LSU accused BRF of "failure to support LSU's teaching mission," "bad-faith negotiation," "failure to complete . . . contemplated transactions," *id.* at 9, "failure to work collaboratively with LSU," *id.* at 18, and failure to "develop[] a financially sustainable business model," *id.* at 33—among many, many other things. LSU sought declaratory and injunctive relief of various kinds, with the dominant theme being a desire to sever its ties with BRF. *Id.* at 41–44. The truth or falsity of these allegations is irrelevant for present purposes; all that matters is that LSU made them and that LSU attempted to cut ties with BRF in 2015.

And that's the end of BRF's Section 1 claim. To plead an agreement, BRF needed to plausibly allege that LSU's refusal to cooperate with BRF was a response to Willis-Knighton's threat—as opposed to an ordinary, self-interested decision that BRF wasn't a good business partner. *See Twombly*, 550 U.S. at 557 (allegations "merely consistent with" an agreement aren't good enough); *Viazis*, 314 F.3d at 762. But if LSU tried to cut off BRF before Willis-Knighton's alleged coercion *even began*, then how can LSU's refusals to collaborate with BRF have been a response to the coercion? At the very most, BRF's allegations are consistent with an agreement. But that's not enough. *See Twombly*, 550 U.S. at 557 (laying out "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement").

Pressed with this point at oral argument, BRF offered two responses. First, even though LSU had already been cooling on its relationship with BRF before Willis-Knighton's alleged threats, the relationship really deteriorated after the threats began. Perhaps that explanation is conceivable. But given LSU's unambiguous efforts to cut ties through state-court litigation, it's not plausible. *See Twombly*, 550 U.S. at 570 ("Because the plaintiffs here have not

nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."). Second, BRF asserts that, in the months *after* LSU filed its 2015 state-court lawsuit and *before* Willis-Knighton's coercion began, LSU had decided to continue partnering with BRF after all. And it was only Willis-Knighton's threats that caused LSU to renew its efforts to cut off BRF. But BRF can't muster any reason (besides, perhaps, wishful thinking) to find that made-to-order account plausible. *See ibid.*

## B.

BRF also says Willis-Knighton violated Section 2 of the Sherman Antitrust Act by committing actual and/or attempted monopolization. We (1) lay out the rules governing Section 2 claims and explain that BRF is relying on an exclusive-dealing theory. Then we (2) explain that BRF's failure to plausibly allege market foreclosure is fatal to this theory.

## 1.

In relevant part, Section 2 bans attempts to monopolize or monopolization of "any part of the trade or commerce among the several States." 15 U.S.C. § 2; *see also id.* § 15 (private cause of action). Unlike Section 1, Section 2 "covers both concerted and independent action." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010). But monopolization is harder to establish than the mere restraint of trade that suffices in the Section 1 context. *See ibid.* That's because "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place." *Verizon Commc'ns Inc. v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

The first element of a Section 2 actual-monopolization claim is "possession of monopoly power." *Eastman Kodak Co. v. Image Tech. Servs.,*

504 U.S. 451, 481 (1992); *see also Trinko*, 540 U.S. at 407 (similar). Willis-Knighton didn't contest its monopoly power in the district court, and it doesn't do so now.

Thus, the Section 2 claim in this case turns on the second element: anticompetitive (or "exclusionary") conduct. Anticompetitive conduct is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak*, 504 U.S. at 482–83 (quotation omitted); *see also United States v. Griffith*, 334 U.S. 100, 108 (1948) (similar). Attempted monopolization, of course, is similar but allows for liability even if the monopoly never came to fruition. *See Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993) (A defendant commits attempted monopolization if it "(1) . . . has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."); *accord Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).

2.

Within that general framework, plaintiffs avail themselves of various theories in their efforts to establish anticompetitive conduct. *See, e.g.*, *OJ Com. LLC v. KidKraft Inc.*, 34 F.4th 1232, 1244 (11th Cir. 2022) (Pryor, C.J.) (explaining that the plaintiffs "advance[d] two theories of harm in support of" the anticompetitive-conduct element and going on to address each theory separately); *Apani Sw., Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 625–26 (5th Cir. 2002) (similar).

BRF hasn't been entirely clear on its theory here. Based on the complaint and the briefing, the two likeliest candidates are conditional refusal to deal and flat refusal to deal. But at oral argument, BRF expressly waived reliance on the latter. So we limit our analysis to the former.

No. 21-30622

Despite the long name, conditional refusals to deal are functionally equivalent to exclusive-dealing arrangements. As the Eleventh Circuit has explained, a conditional refusal to deal amounts to "one firm unilaterally refusing to deal with another firm unless some condition is met." *OJ Com.*, 34 F.4th at 1247 (quotation omitted). An exclusive-dealing arrangement is a conditional refusal to deal where the condition is exclusivity. Because of that similarity, the Eleventh Circuit "treats conditional refusals to deal . . . and exclusive dealing as synonymous" for doctrinal purposes. *Ibid.* (quotation omitted). We will do the same here.

BRF says Willis-Knighton refused to deal with (*i.e.*, donate to) LSU unless LSU refused to cooperate with BRF. And on BRF's view, that exclusivity condition was anticompetitive because it aimed to decrease BRF's supply of LSU-trained physicians (and to harm BRF in other ways) thereby excluding it from the Shreveport healthcare market.[4]

Substantial foreclosure is a prerequisite for every exclusive-dealing Section 2 claim. *Denison Mattress Factory v. Spring-Air Co.*, 308 F.2d 403, 410 (5th Cir. 1962) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320,

---

[4] BRF also suggests that Willis-Knighton attempted to raise BRF's costs. *See* Thomas Krattenmaker & Steven Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 Yale L.J. 209 (1986) (arguing that taking actions to raise a rival's costs can sometimes amount to a Section 2 violation). We don't doubt that raised costs can be a form of antitrust injury in cases where the defendant has *already* violated antitrust law in some other way. *See Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 368 (7th Cir. 1987) (Easterbrook, J.) (discussing raised costs along these lines). But we are skeptical of raised costs as a standalone theory. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 651 (2022) (describing raising rivals costs as a "sometimes useful but also incomplete definition of exclusionary practices."). Regardless, in *this* case, it's clear that the only way Willis-Knighton might have raised BRF's costs is through its exclusive-dealing arrangement with LSU. BRF's raised-costs argument therefore stands or falls with its exclusive-dealing theory. We need not decide whether raised costs can ever function as a standalone Section 2 theory.

329 (1961)); *see also OJ Com.*, 34 F.4th at 1249–50 (applying the substantial-foreclosure requirement to a Section 2 claim and rejecting the argument that substantial foreclosure sometimes is not required). The substantial-foreclosure analysis has three steps. First, identify the relevant product market. Second, identify the relevant geographic market. And third, "show that the competition foreclosed by the arrangement constitutes a substantial share of the relevant market." *Apani*, 300 F.3d at 625 (quotation omitted) (citing *Tampa Elec.*, 365 U.S. at 327–28); *accord Gurrola v. Walgreen Co.*, 791 F. App'x 503, 504 n.5 (5th Cir. 2020) (per curiam).

BRF's complaint alleges the first two steps. First, it identifies two relevant product markets: "the market for general acute care inpatient hospital services for commercially insured patients," and the market for "general acute care outpatient services" to commercially insured patients. Second, it identifies "the Shreveport-Bossier City area" as the relevant geographic market. The district court adopted those market definitions for the sake of argument, and Willis-Knighton does not contest them in its briefing.

But BRF hasn't plausibly alleged the third element. An actual-monopolization plaintiff must allege that the defendant's exclusive-dealing arrangement has caused substantial market foreclosure, and an attempted-monopolization plaintiff must allege a "dangerous probability" that it will do so. *Spectrum Sports*, 506 U.S. at 455–56; *see also Tampa Elec.*, 365 U.S. at 327; *Apani*, 300 F.3d at 625. BRF has done neither.

One set of BRF's allegations—that Willis-Knighton's exclusive-dealing arrangement ended up hurting BRF's bottom line—is irrelevant. BRF gives a laundry list of efficiency-enhancing, cooperative BRF/LSU projects that LSU refused to undertake. And it says it would've been significantly better off in a world where those projects came to fruition rather

than dying on the vine. But of course, those allegations have nothing to do with BRF's getting shut out of any market at all. So they're irrelevant for foreclosure purposes.

Other allegations do touch on the topic of foreclosure, but they are conclusory. *See Twombly*, 550 U.S. at 557 (conclusory allegations are insufficient). The following paragraph from the complaint is typical:

> But for [Willis-Knighton's] anticompetitive activities, University Health-Shreveport would have been a significantly more successful competitor to Willis-Knighton, and would have reduced Willis-Knighton's dominant market share, permitting more patients to receive care at lower prices. As a result of Willis-Knighton's actions, its market dominance was maintained and enhanced, and competition and the public have been seriously harmed.

Another example: "LSU Health Shreveport's refusal to cooperate in [the area of physician recruitment] directly eliminated competition for Willis-Knighton and stymied [BRF's] ability to directly challenge an important source of Willis-Knighton's dominance." Another: "A portion of the damages to [BRF] resulted from decreased volumes, which also resulted in decreased market share, maintaining and enhancing Willis-Knighton's monopoly power. The remainder of the damages resulted from higher costs, which constrained [BRF] from making more vigorous competitive efforts against Willis-Knighton." BRF also asserts that "[t]he actions described herein reduced [BRF's] share, or prevented [BRF] from increasing its share, in each of the relevant markets by at least" two percentage points—though it doesn't offer any explanation for that conclusion.

Those allegations are little more than high-level assertions about how wonderful things would be if Willis-Knighton hadn't formed an exclusive-dealing arrangement with LSU. They don't tell a coherent story about how

the arrangement prevented BRF from providing healthcare services to any portion of the market. In short, they are miles away from plausibly alleging that Willis-Knighton came close to substantially foreclosing the Shreveport healthcare market.

Even if those allegations weren't conclusory, BRF's complaint would still fail. The complaint alleges that Willis-Knighton's exclusive dealing arrangement affected the upstream market for physician services. Then the complaint alleges foreclosure in the downstream medical services market. But BRF doesn't adequately connect the two. After all, it's not as though Willis-Knighton had an exclusive deal with insurers or patients. One could imagine how that sort of arrangement might affect the downstream medical-services market. But as it is, BRF offers no explanation for how Willis-Knighton's exclusive-dealing arrangement with LSU—whose main relevant function seems to be supplying physicians to both Willis-Knighton and BRF—could foreclose the medical-services market.

Perhaps BRF could have avoided this problem by alleging a market for physicians and arguing Willis-Knighton substantially foreclosed *that* market. But BRF can't take that route now for two reasons. First, the complaint already chose which market to allege. And it chose to focus on downstream markets for healthcare services—*not* the upstream market for physicians. BRF can't change horses midstream. *See Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court."). Second, though the complaint asserts that BRF had no choice but to get physicians from LSU, it admits this was a pre-existing "provision in the hospital by-laws." All LSU did was "refuse[] to waive" that provision and refuse to "freely provide courtesy faculty appointments to independent physicians who wished to practice at" BRF. But if the restriction admittedly pre-existed anything Willis-Knighton did, there's no way Willis-Knighton's behavior could have

caused it. So even if the restriction threatened substantial foreclosure—which BRF hasn't alleged—BRF still would've failed to plead causation. *See Bell Atl.*, 339 F.3d at 302 (explaining that private antitrust plaintiffs must "establish that it was the defendant's conduct that actually caused" plaintiff's injury).

\* \* \*

BRF failed to state a claim. We therefore need not reach antitrust injury or the *Noerr-Pennington* doctrine.

AFFIRMED.