[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-11521

_____

OJ COMMERCE, LLC,
NAOMI HOME, INC.,

                                            Plaintiffs-Appellants,

*versus*

KIDKRAFT, INC.,
MIDOCEAN PARTNERS IV, L.P.,

                                            Defendants-Appellees,

IKEA North America Services, LLC.,

                                            Defendant.

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-60341-MGC

———————————————

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM, and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This antitrust appeal presents two questions. The first is whether MidOcean Partners IV, L.P., a private-equity firm, and KidKraft, Inc., a majority-owned subsidiary, are capable of conspiring with one another in violation of section one of the Sherman Act. *See* 15 U.S.C. § 1. The second is whether OJ Commerce, LLC, a retailer, and Naomi Home, Inc., a manufacturer, have marshalled substantial evidence to support their claim that KidKraft monopolized the market for the manufacture of wooden play kitchens in violation of section two of the Act. *See id.* § 2. Because we conclude that a company ordinarily cannot conspire with an entity it owns and controls and with which it does not compete, the district court correctly entered a summary judgment in favor of MidOcean and KidKraft on the section-one claim. The district court also correctly entered a summary judgment against the section-two claim because OJ Commerce and Naomi Home failed to present substantial evidence to support a viable theory of monopolization. And, because the remaining claim, premised on state law, rises and falls

with the antitrust claims, the district court correctly entered a summary judgment against that claim. We affirm.

## I.  BACKGROUND

KidKraft manufactures wooden play kitchens and other children's toys. It sells its products to tens—and sometimes hundreds—of commercial resellers. Those resellers include large retailers such as Amazon, Costco, Sam's Club, and Walmart.

OJ Commerce, a smaller online retailer, began purchasing wooden play kitchens from KidKraft in 2011. OJ Commerce describes itself as "an aggressive discounter" that "incentivizes other sellers . . . to keep their own prices on [the same] products low." And it was "at times ranked as high as [the] 13th largest" customer of KidKraft products. The company is owned and operated by Jacob Weiss.

Weiss also owns and operates Naomi Home, a manufacturer that, in 2011, sold exclusively to OJ Commerce. Naomi Home uses sales data from OJ Commerce "[a]s part of its market research to develop products." In 2013, Naomi Home began selling a wooden play kitchen through OJ Commerce. The parties dispute the degree of similarity between the Naomi Home kitchen and KidKraft's kitchen—KidKraft describes the former as a "knock-off" of the latter. Naomi Home also began "developing other play kitchens," but did not sell those kitchens during the relevant period.

In July 2015, private-equity firm MidOcean acquired a 57 percent ownership interest in KidKraft Group Holdings, LLC, the

company that wholly owns KidKraft. The acquisition agreement gave MidOcean the right to appoint a majority of the KidKraft board of directors, and MidOcean has exercised that right. MidOcean also enjoys certain approval rights. For example, MidOcean's written approval is required before KidKraft may appoint or remove officers, enter into corporate transactions worth over $1 million, or change the size of the board. MidOcean has no other investments in the children's toy industry.

Sometime in 2015, Matan Wolfson, a KidKraft employee, had a conversation with Weiss about the Naomi Home kitchen. As Weiss recalls the conversation, "KidKraft was very upset about [the kitchen] and wanted to end its relationship with OJ Commerce." Wolfson asked Weiss why OJ Commerce was "competing with KidKraft." Weiss "told [Wolfson] that [OJ Commerce] was not competing with KidKraft because [OJ Commerce] w[as] selling to consumers and KidKraft was selling to retailers." Weiss also told Wolfson that Naomi Home "would agree not to produce any additional new items . . . that would compete with KidKraft and . . . wouldn't reach out to any of KidKraft's retailers [other than OJ Commerce] to compete with KidKraft." Wolfson replied that he was "going to take it up the chain and . . . let [Weiss] know." "But [Weiss] . . . didn't hear[] . . . back from him," and "the situation went away." Still, at Weiss's direction, Naomi Home "dropped plans to develop additional products" and "did not . . . try to sell any [of its] products to any retailers for approximately two years."

OJ Commerce continued to sell Naomi Home kitchens, and KidKraft continued to supply its own kitchens to OJ Commerce.

The relationship between KidKraft and OJ Commerce came to an end in 2016. That year, OJ Commerce's sales of KidKraft's products "plummeted," although the parties dispute the cause of this decline. According to KidKraft, it believed that OJ Commerce "was using KidKraft's kitchen as a prop to drive consumers to the Naomi Home kitchen and was no longer focused on selling KidKraft's kitchens." OJ Commerce, by contrast, blames KidKraft for "not making inventory available . . . during this time period." Whatever the cause, a MidOcean board member reached out to KidKraft in November and instructed KidKraft to contact OJ Commerce about the "decline in sales." According to Weiss, KidKraft told him that it "was going to cut OJ[] [Commerce] off because it sold [Naomi Home]." Weiss urged KidKraft to change its mind, but KidKraft stopped supplying OJ Commerce two days later.

Following the termination, sales of Naomi Home wooden play kitchens "increased considerably," and Naomi Home attempted to sell the kitchens to third-party retailers. The company hired Michael Drobnis, a seasoned independent sales representative, for that task. But "every retailer [he] contacted declined . . . to carry Naomi Home's [k]itchen." Drobnis "received the impression that [the retailers] did not want to carry a product that would directly compete with Kid[K]raft and thereby upset the applecart." Drobnis put Weiss in touch with Shannon Lord, a Costco employee who explained to Drobnis in February 2017 "that the

[wooden play kitchen] category was already filled." On a telephone call, Lord told Weiss that "Costco did not want to jeopardize its relationship with KidKraft by purchasing Naomi Home kitchens."

OJ Commerce and Naomi Home sued KidKraft and MidOcean. OJ Commerce and Naomi Home alleged that "KidKraft control[led] over 70% of the wooden play kitchen market in the continental United States." They asserted that "KidKraft's termination of its relationship with OJ[] [Commerce] had no legitimate business justification or procompetitive benefit" and violated section two of the Sherman Act. *See* 15 U.S.C. § 2. They asserted that, alternatively, the termination was a form of attempted monopolization, a separate violation of section two. *See id.* They asserted that KidKraft and MidOcean had violated section one of the Sherman Act, *see id.* § 1, by conspiring "to refuse to sell and boycott OJ[] [Commerce], solely on the basis of it selling the competing Naomi Home [k]itchen." They asserted that MidOcean committed tortious interference with contract by "induc[ing] KidKraft to terminate its business relationship with OJ[] [Commerce]." And they sought damages, including treble damages for the Sherman Act violations. *See id.* § 15(a).

At the close of discovery, KidKraft and MidOcean moved for summary judgment. By then, OJ Commerce and Naomi Home had come up with an additional theory in support of the section-two monopolization claim: "that KidKraft foreclosed [Naomi Home]'s access to retail channels of distribution by threatening other retailers that KidKraft would withhold sales of its toy kitchens if those

retailers did business with [Naomi Home]." KidKraft argued that "there [was] no evidence to support [this] theory," and that, in any event, there was no evidence "that KidKraft foreclosed such a substantial portion of the market that competition was thereby harmed." As for the theory that KidKraft violated section two by terminating its relationship with OJ Commerce, KidKraft argued that the unilateral termination of a distributor is lawful under the Sherman Act; that a "rare exception to th[is] general rule" did not apply; that the termination did not cause anticompetitive harm; and that KidKraft had legitimate business reasons to justify the termination. KidKraft also argued that OJ Commerce and Naomi Home had failed to prove that KidKraft had monopoly power. MidOcean and KidKraft argued that the section-one claim failed because "MidOcean owns and controls KidKraft," so the two entities are "incapable of conspiring with one another." And MidOcean argued that the state-law claim failed because "the only torts . . . allege[d] [were] the alleged actions underlying the antitrust claims." "Thus, if the[] antitrust claims fail, so too must the[] tortious interference claim."

OJ Commerce and MidOcean opposed the motion. They argued, on the section-two claims, that it was a question of fact for the jury whether KidKraft had "threatened any other vendors for selling [Naomi Home] products"; there was no requirement to prove substantial foreclosure; the termination fell within the small class of unilateral terminations that are prohibited by section two; there was proof that KidKraft's "actions harmed competition by

causing increased prices and reduced product choice and innovation"; and there were disputes of fact about the reasons KidKraft advanced for the termination. They also argued that they had established that KidKraft enjoyed monopoly power in the market for wooden play kitchens. They argued, on the section-one claim, that KidKraft "is not a 'wholly owned' subsidiary of [MidOcean]." And they argued that the state-law claim was viable because their antitrust claims were meritorious.

After the parties were permitted to conduct additional discovery and file supplemental briefing, the district court entered summary judgment in favor of KidKraft and MidOcean. The district court found that there were "material issues of fact . . . as to the relevant product market and market power." It also found a genuine dispute regarding whether KidKraft and MidOcean were capable of conspiring for purposes of section one. But it entered summary judgment against the antitrust claims because OJ Commerce and Naomi Home "failed to establish harm to competition." It reasoned that the purported harm was "speculative" and amounted to "harm to competitors—not harm to the competition process in general, as required by law." And it granted summary judgment against the state-law claim because OJ Commerce and Naomi Home "conceded that their state law claim relies on their ability to succeed on their antitrust claim." Because it considered the absence of evidence of harm to competition to be fatal to the antitrust claims, the district court did not decide whether there was

a genuine dispute about KidKraft's justifications for the termination. OJ Commerce and Naomi Home timely appealed.

## II. STANDARD OF REVIEW

"We review a summary judgment *de novo.*" *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022). "Summary judgment is only appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted). We "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

We divide our discussion of the merits in three parts. We first explain why, as a matter of law, MidOcean and KidKraft cannot conspire under section one of the Sherman Act. We next explain why the section-two monopolization claim fails. Finally, we explain why the state-law claim similarly fails. We do not address the attempted-monopolization claim because OJ Commerce and Naomi Home forfeited any challenge to the dismissal of that claim by failing to address its merits in their initial brief. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).

Before turning to the merits, we explain why we have not redacted the public version of this opinion even though it discusses record evidence that the parties, with our permission, filed under

seal. We granted the parties' motions to redact portions of the publicly available versions of their appellate briefs based on representations that those briefs "contain[ed] '[c]onfidential' or '[h]ighly [c]onfidential' information." But much of the information that was redacted should not have been.

There is a presumption that material attached to or included in a substantive filing, such as an appellate brief, "is subject to the public right of access." See Romero v. Drummond Co., 480 F.3d 1234, 1245–46 (11th Cir. 2007); accord Callahan v. United Network for Organ Sharing, 17 F.4th 1356, 1362 (11th Cir. 2021). The presumption "may be overcome by a showing of good cause." Romero, 480 F.3d at 1246. That showing ordinarily requires a party to establish that it has a "legitimate . . . privacy or proprietary interest in information" and that this interest would likely be harmed "if made public." See id.; Callahan, 17 F.4th at 1363 ("Concerns about trade secrets or other proprietary information . . . can overcome the public interest in access to judicial documents."). It follows that a party should not seek to seal information that is already public, see Perez-Guerrero v. U.S. Att'y Gen., 717 F.3d 1224, 1236 (11th Cir. 2013), or that would cause no harm to a party if disclosed, see Romero, 480 F.3d at 1246. But much of the redacted information—including the information we recount throughout this opinion—does not satisfy the good-cause requirement.

Publication of some of the redacted information would not harm a legitimate privacy or proprietary interest. Consider, for example, the sixth page of OJ Commerce and Naomi Home's

opening brief. The first of two redactions on that page conceals that, before termination, OJ Commerce was a "top-20" reseller of KidKraft products. Assuming this fact was once private or proprietary, it is unclear how the publication today of a six-year-old tidbit about the parties' now-terminated relationship could harm a legitimate interest. Cf. *Joy v. North*, 692 F.2d 880, 894 (2d Cir.1982) ("[A] naked conclusory statement that publication of the [sealed document] will injure the [party] in the industry and local community falls woefully short of the kind of showing which raises even an arguable issue as to whether it may be kept under seal."). The second redaction conceals a statement from OJ Commerce and Naomi Home's expert that "[Naomi Home] stopped development of a train table and a dollhouse when KidKraft said it would stop selling to OJ[] [Commerce] if OJ[] [Commerce] continued to sell the [Naomi Home] [k]itchen." (Alteration adopted.) Again, there is no legitimate privacy or proprietary interest that could be harmed by the publication of this statement. Perhaps OJ Commerce and Naomi Home are embarrassed that Weiss allegedly agreed to a course of conduct they now claim to be anticompetitive. But the "desire to keep indiscreet communications out of the public eye . . . is not enough to satisfy our standard for good cause." *Callahan*, 17 F.4th at 1364.

Some of the information is also already publicly available. See *Perez-Guerrero*, 717 F.3d at 1236. For example, OJ Commerce and Naomi Home have redacted KidKraft's alleged market share, even though they mentioned the figure in their publicly filed

complaint, and even though the district court also mentioned that figure in its publicly filed opinion. Similarly, OJ Commerce and Naomi Home have disclosed certain information in their initial brief, only to redact that same information in their reply brief.

### A.  MidOcean and KidKraft are Incapable of Conspiring under Section One.

"The Sherman Act contains a basic distinction between concerted and independent action." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984) (internal quotation marks omitted). Section one of the Sherman Act, which prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade," 15 U.S.C. § 1, concerns only "[c]oncerted activity," *Copperweld*, 467 U.S. at 768. By its terms, the section "does not reach conduct that is wholly unilateral." *Id.* (internal quotation marks omitted). "[U]nilateral activity" is instead the concern of section two of the Act. *Id.*

When assessing whether concerted activity is present, "it is not determinative that [the] two parties to an alleged [section] 1 violation are legally distinct entities." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196 (2010). "The question is whether the [relevant] agreement joins together independent centers of decisionmaking." *Id.* (internal quotation marks omitted). "If it does, the entities are capable of conspiring under [section] 1, and the court must decide whether the restraint of trade is an . . . illegal one." *Id.* This "inquiry is one of competitive reality," *see id.*; a court must determine "whether there is a contract, combination, or conspiracy amongst separate economic actors pursuing separate

economic interests, such that the agreement deprives the market-place of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition," *id.* at 195 (alteration adopted) (citations and internal quotation marks omitted).

Two decisions of the Supreme Court guide our review. In *Copperweld Corp. v. Independence Tube Corp.*, the Court held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of [section] 1 of the Sherman Act." 467 U.S. at 771. The Court explained that "a parent and a wholly owned subsidiary *always* have a unity of purpose or a common design." *Id.* (internal quotation marks omitted). And "[t]hey share a common purpose whether or not the parent keeps a tight rein over the subsidiary . . . [because] the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests." *Id.* at 771–72.

By contrast, the Court later held in *American Needle, Inc. v. National Football League*—a lawsuit about professional football teams' licensing of intellectual property—that the National Football League and its constituent teams *were* capable of conspiring in violation of the Sherman Act. *See* 560 U.S. at 186–87. Because "[e]ach of the teams [was] a substantial, independently owned, and independently managed business[,] '[t]heir general corporate actions [were] guided or determined' by 'separate corporate consciousnesses,' and 'their objectives [were]' not 'common.'" *Id.* at 196 (alteration adopted) (quoting *Copperweld*, 467 U.S. at 771).

Moreover, "[t]he teams compete[d] with one another, not only on the playing field, but [also] . . . in the market for intellectual property." *Id.* at 196–97. So, "[d]ecisions by [League] teams to license their separately owned trademarks collectively . . . [were] decisions that 'depriv[ed] the marketplace of independent centers of decisionmaking.'" *Id.* at 197 (quoting *Copperweld*, 467 U.S. at 769).

Although the Supreme Court has declined to address "under what circumstances, if any, a parent may be liable for conspiring with [a subsidiary] it does not completely own," *Copperweld*, 467 U.S. at 767, *Copperweld* and *American Needle* suggest that "the presence of a minority interest in a 'subsidiary' corporation does not itself dictate that the subsidiary can conspire with the 'parent' corporation that controls it," *see* 7 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1466a, at 234 (4th ed. 2017). Particularly when none of the participants are competitors, the majority and minority interest-holders will usually have a unity of economic interests. *See id.* ¶ 1466d3, at 238. And because the Supreme Court has "suggested that the core . . . of Sherman Act [section] 1's conspiracy concept is the aggregation of previously independent market power," *id.* ¶ 1466a, at 234, agreements between non-competing entities that aggregated their decision-making *before* the alleged conspiracy took place will ordinarily not implicate that concern. For that reason, "majority ownership and control should be presumptively decisive" when determining whether a parent and subsidiary can conspire. *Id.*

As we have already explained, MidOcean owns nothing other than its interest in KidKraft that sells toys of any type. And as noncompetitors, MidOcean and KidKraft are incapable of conspiring for purposes of section one because the evidence establishes that MidOcean has majority ownership of and controls KidKraft. It is undisputed that, during the relevant period, MidOcean owned approximately 57 percent of the membership interests in the company that wholly owns KidKraft. MidOcean also controlled KidKraft. Under the acquisition agreement, MidOcean "appoint[s] a majority of the seats on the KidKraft [b]oard of [d]irectors." MidOcean "maintains control over the strategic direction of KidKraft and controls the hiring and firing of the executive officers of KidKraft." KidKraft requires MidOcean's prior approval to change the size of the KidKraft board, appoint or remove officers, or enter into a transaction "in excess of $1 million." And MidOcean "retains the authority to wind up KidKraft's activities." KidKraft is also MidOcean's "only investment in the children's toy industry." *Cf. Am. Needle*, 560 U.S. at 197 (considering it "[d]irectly relevant" to the analysis that "the teams compete in the [relevant] market"). Because MidOcean controlled and majority-owned KidKraft before the agreement at issue, the two entities shared a single "corporate consciousness," *see Copperweld*, 467 U.S. at 771, and the agreement could not "deprive[] the marketplace of independent centers of decisionmaking," *see Am. Needle*, 560 U.S. at 195 (internal quotation marks omitted).

OJ Commerce and Naomi Home argue that this "inquiry [presents] a fact-intensive issue for the jury," but they do not identify any facts that would permit a reasonable jury to conclude that KidKraft and MidOcean are "separate economic actors pursuing separate economic interests." *See Copperweld*, 467 U.S. at 769. OJ Commerce and Naomi Home mention that KidKraft and MidOcean "have separate officers[,] . . . [and] separate corporate headquarters in locations thousands of miles from each other," and that "[d]ecisions relating to KidKraft's day-to-day operations are made by KidKraft's own management team rather than by MidOcean." But "[t]he[se] factors simply describe the manner in which [a] parent chooses to structure a subunit of itself," *id.* at 772 n.18—a "formalistic distinction[]" that is of little relevance to the "functional analysis" the Court must perform, *see Am. Needle*, 560 U.S. at 191–92; 7 AREEDA & HOVENKAMP, *supra*, ¶ 1467d2, at 245 ("[W]hether related corporations share offices, employees, or officers is irrelevant to the unity of their operation."). Under that functional analysis, KidKraft and MidOcean "share a common purpose whether or not [MidOcean] keeps a tight rein over [KidKraft]" because the evidence establishes that MidOcean "may assert full control at any moment if [KidKraft] fails to act in [MidOcean's] best interests." *See Copperweld*, 467 U.S. at 771–72; 7 AREEDA & HOVENKAMP, *supra*, ¶ 1467a, at 242 ("[M]ajority ownership with its centralized power to control, whether or not apparently exercised in detail on a day-to-day basis, creates a single entity for antitrust purposes.").

B.  *The Record Presents No Substantial Evidence that MidOcean and KidKraft Violated Section Two.*

Although section two of the Sherman Act prohibits "monopoliz[ing], or attempt[ing] to monopolize . . . any part of the trade or commerce among the several States," 15 U.S.C. § 2, "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is . . . not unlawful," *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Because "[t]he opportunity to charge monopoly prices—at least for a short period—is what . . . induces [the] risk taking that produces innovation and economic growth, . . . the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*" *Id.* To prove monopolization in violation of section two, a plaintiff must establish "(1) the possession [by the defendant] of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293–94 (11th Cir. 2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). We also require section-two plaintiffs to prove "harm to competition . . . within [the] relevant . . . market." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1074 (11th Cir. 2004) (internal quotation marks omitted).

The first element—monopoly power in a relevant market—is not at issue because KidKraft does not challenge the

determination of the district court that "material issues of fact exist as to the relevant product market and market power." So, we proceed from the assumption that the relevant market is the market for wooden play kitchens in the United States. And we assume that KidKraft possessed monopoly power in that market throughout the relevant period.

OJ Commerce and Naomi Home advance two theories of harm in support of the second element. First, OJ Commerce argues that KidKraft's termination of its relationship with OJ Commerce was an unlawful refusal to deal. Second, Naomi Home argues that KidKraft engaged in "unlawful monopoly maintenance" by threatening "other vendors for selling [Naomi Home] products."

We address each theory of harm in turn, and we explain why KidKraft was entitled to a summary judgment in its favor. We also reject the contention that KidKraft has forfeited many of the arguments it presses on appeal.

### 1. The Refusal-To-Deal Theory Is Not Viable.

"[T]he Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 408 (alteration adopted) (internal quotation marks omitted). So, "the monopolist's unilateral refusal to deal is not ordinarily a suspect act." 3 AREEDA & HOVENKAMP, *supra*, ¶ 658f, at 187. Still, "the right is [not] unqualified," *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S.

585, 601 (1985), and "a refusal to deal under some circumstances 'can constitute anticompetitive conduct and violate [section] 2,'" *Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1265 (11th Cir. 2015) (quoting *Trinko*, 540 U.S. at 408). But because "the [Supreme] Court has 'been very cautious in recognizing exceptions' to th[e] [general] rule," we must begin by considering "whether [the] refusal to deal alleg[ed] [here] 'fit[s] within existing exceptions or provide[s] a basis, under traditional antitrust principles, for recognizing a new one.'" *Id.* (alteration adopted) (quoting *Trinko*, 540 U.S. at 408).

OJ Commerce does not ask us to craft a new exception and argues only that the exception in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.* applies. "[I]n *Aspen Skiing*, a system was developed in Aspen, Colorado[,] at a time when each of its [four] major ski resorts were independently owned, under which skiers could purchase an 'all-Aspen' pass that would allow them to use specially-purchased tickets interchangeably at all the resorts." *Duty Free Ams.*, 797 F.3d at 1265–66. "One company, Ski Co., subsequently gained control of three of the four major resorts, but the fourth, Highlands, remained independent." *Id.* at 1266. "Ski Co. then unilaterally discontinued the 'all-Aspen' pass, and subsequently refused to enter into any cooperative arrangement allowing Highlands customers access to any of its resorts." *Id.* "It also refused to sell lift tickets to Highland, even when Highland offered to pay the market retail price of the tickets." *Id.* The Supreme Court "upheld a jury verdict for [Highlands], reasoning that 'the jury may well

have concluded that [Ski Co.] elected to forgo these short-run benefits because it was more interested in reducing competition over the long run by harming its smaller competitor.'" *Trinko*, 540 U.S. at 409 (alterations adopted) (quoting *Aspen Skiing*, 472 U.S. at 608).

*Aspen Skiing* does not assist OJ Commerce. The Supreme Court in "*Trinko* clarified that *Aspen Skiing* embodies only a 'limited exception' to the general rule that firms may choose the other companies with which they deal." *Duty Free Ams.*, 797 F.3d at 1266 (quoting *Trinko*, 540 U.S. at 409). And because "*Aspen Skiing* is at or near the outer boundary of [section] 2 liability," *Trinko*, 540 U.S. at 409, the Supreme Court has declined to extend the exception when presented with facts that differ materially from those presented in *Aspen Skiing*, *see id.* at 409–11 (distinguishing and declining to extend the *Aspen Skiing* exception); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448–50 (2009) (applying, in a section-two case involving a "price-squeeze claim[]," the general rule of non-liability stated in *Trinko* and distinguishing *Aspen Skiing*). The courts of appeals have followed suit. *See, e.g.*, *Duty Free Ams.*, 797 F.3d at 1267–68; *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074–76 (10th Cir. 2013) (Gorsuch, J.); *cf. Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 458–59 (7th Cir. 2020) (applying *Aspen Skiing* only after comparing the facts presented in the appeal with thirteen "facts found . . . in *Aspen Skiing* . . . which the Supreme Court considered significant to its analysis"). The facts here are materially different from those in *Aspen Skiing*.

"[T]he present case does not fit within the limited exception recognized in *Aspen Skiing*" because OJ Commerce has not established "that [KidKraft] voluntarily engaged in a course of dealing with its rivals." *See Trinko*, 540 U.S. at 409; *Novell*, 731 F.3d at 1074 ("To invoke *Aspen*'s limited exception, the Supreme Court and we have explained, . . . there must be a preexisting voluntary and presumably profitable course of dealing between the monopolist and rival."); *Transhorn, Ltd. v. United Techs. Corp.* (*In re Elevator Antitrust Litig.*), 502 F.3d 47, 53 (2d Cir. 2007) ("Th[e] [*Aspen Skiing*] exception applies when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor."). The competitors in *Aspen Skiing* had "cooperated for years" to sell a "joint offering." *Trinko*, 540 U.S. at 408–09; *see also Viamedia*, 951 F.3d at 458–59 (listing the "[l]ong-term business relationship that created [a] joint offering" in *Aspen Skiing* as a "significant" fact). By contrast, there is no evidence here of a joint offering by competitors. KidKraft did not voluntarily engage in a course of dealing with its competitor, Naomi Home. And OJ Commerce, which *did* have an established commercial relationship with KidKraft, was not a competitor in the relevant market.

Because KidKraft and Naomi Home were never in business together, KidKraft's termination of its relationship with OJ Commerce also did not cause Naomi Home's "share of the market for [wooden play kitchens to] decline[] steadily." *See Aspen Skiing*, 472 U.S. at 594; *cf. Duty Free Ams.*, 797 F.3d at 1266 ("[In *Aspen Skiing*,] Highlands's market share dropped from approximately 20% to

11% over the four year period after the pass was discontinued."). To the contrary, it is undisputed that, "after KidKraft's termination of its agreement with OJ[] [Commerce], [Naomi Home's] prices fell considerably while its sales of [wooden play kitchens] increased considerably." And Naomi Home attributes this expansion in output to the "terminat[ion] [of OJ Commerce's] relationship" with KidKraft. In other words, KidKraft's termination of OJ Commerce fostered the growth of a new entrant in the market—a result that OJ Commerce agrees is pro-competitive. Extending *Aspen Skiing* to a situation in which termination led to the *growth* of a competitor would be inconsistent with the hornbook principle that "it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–110 (1986) (alterations adopted) (internal quotation marks omitted).

In any event, OJ Commerce has failed to offer evidence that would permit a reasonable jury to conclude that the termination harmed competition in the market for wooden play kitchens. *See Spanish Broad. Sys.*, 376 F.3d at 1074. OJ Commerce argues that the evidence establishes "that [the] termination [of OJ Commerce] was quickly followed by an increase in KidKraft's [wooden play kitchen] prices." But this evidence, without more, is insufficient to prove harm to competition.

"[T]he primary purpose of the antitrust laws is to protect *inter*brand competition," *State Oil v. Khan*, 522 U.S. 3, 15 (1997) (emphasis added)—that is, "the competition among manufacturers

selling *different* brands of the same type of product," *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007) (emphasis added). By contrast, evidence about the effect of termination on the prices retailers charged for KidKraft wooden play kitchens relates to "*intra*brand competition—the competition among retailers selling the *same* brand." *Id.* (emphases added). Because a "reduc[tion] [in] intrabrand competition" "can stimulate interbrand competition," *id.*, an antitrust plaintiff cannot rely on evidence of reduced intrabrand competition alone but must offer evidence connecting that reduction to "marketwide"—that is, interbrand—"increased prices or reduced output," *see Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010); *cf. Spanish Broad. Sys.*, 376 F.3d at 1075 ("[C]onduct that injures individual firms rather than competition in the market as a whole does not violate [s]ection [t]wo."); 3B AREEDA & HOVENKAMP, *supra*, ¶ 760b1, at 51 ("[S]o-called 'intrabrand' restraints . . . are generally irrelevant for Sherman Act [section] 2 purposes, because they do not impair the competitive opportunities of rivals.").

OJ Commerce identifies no evidence of harm to interbrand competition. Instead, it concedes that the "increas[e] [in] price" on which their expert relied was an increase in "the price . . . of *KidKraft*" products. (Emphasis added) (internal quotation marks omitted). And the experts for both sides agree that marketwide unit sales increased year-on-year following KidKraft's termination of OJ Commerce, suggesting that the termination did not cause a marketwide decrease in output. Without evidence establishing or

24                     Opinion of the Court                    21-11521

reasonably implying harm to the interbrand market, OJ Commerce's *Aspen Skiing* theory fails.

> 2.  The Evidence Does Not Support the Monopoly-Maintenance Theory.

Naomi Home argues that KidKraft violated section two by "threaten[ing]" to cut off "vendors for selling [Naomi Home] products," but, as an initial matter, the parties disagree about the correct name for—and test that applies to—this kind of section-two theory of harm. KidKraft contends that Naomi Home's theory of harm must be assessed using the framework for an "exclusive dealing" arrangement. Naomi Home responds that, unlike exclusive-dealing arrangements, which "are common and can be procompetitive," *McWane, Inc. v. Fed. Trade Comm'n*, 783 F.3d 814, 827 (11th Cir. 2015), KidKraft's conduct is a "'naked exclusion'" with "no arguable benefits to competition," (quoting 3B AREEDA & HOVENKAMP, *supra*, ¶ 768a5, at 167). We agree with KidKraft.

Our precedent treats "conditional refusals to deal—i.e., one firm . . . [unilaterally] refus[ing] to deal with another firm unless some condition is met," *Viamedia*, 951 F.3d at 453 (internal quotation marks omitted)—and exclusive dealing as synonymous, *see Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991) ("[A] party may choose with whom he will do business and . . . this behavior . . . [is] referred to as 'exclusive dealing[.]'" (internal quotation marks omitted)); *cf. Le Page's Inc. v. 3M (Minn. Mining & Mfg. Co.)*, 324 F.3d 141, 157 (3d Cir. 2003) (en banc) (explaining that the term "exclusive dealing" includes "arrangements

which, albeit not expressly exclusive, effectively foreclosed the business of competitors"). Because Naomi Home argues that KidKraft refused to deal with retailers unless a certain condition—the retailers' abstention from purchasing Naomi Home products—was met, the theory sounds in exclusive dealing. And Naomi Home's contention about the arguable benefits to competition is relevant to the *merits* of the exclusive-dealing theory, not to its label. *See McWane*, 783 F.3d at 833.

We have employed a burden-shifting approach "to evaluate an exclusive dealing monopoly maintenance [theory of harm]." *Id.* "First, the [plaintiff] must show that the monopolist's conduct had the anticompetitive effect of harming competition, not just a competitor." *Id.* (alteration adopted) (internal quotation marks omitted). "If the [plaintiff] succeeds in demonstrating this anticompetitive harm, the burden then shifts to the defendant to present procompetitive justifications for the exclusive conduct, which the [plaintiff] can refute." *Id.* "If the court accepts the defendant's proffered justifications, it must then decide whether the conduct's procompetitive effects outweigh its anticompetitive effects." *Id.* As part of its initial burden to prove anticompetitive harm, the plaintiff must prove that "the exclusive dealing arrangements" foreclosed "a substantial share of the market." *Id.* at 837.

We divide our discussion of the exclusive-dealing theory in two parts. We first explain that some of Naomi Home's account of KidKraft's exclusionary conduct is not supported by substantive

evidence. We then explain that Naomi Home has failed to prove substantial foreclosure.

a.  The Evidence Does Not Create a Genuine Dispute About
     Some of the Alleged Exclusionary Conduct.

Naomi Home contends that it has elicited sufficient evidence to proceed to trial on its exclusive-dealing theory because "KidKraft took two distinct actions to stop [its] market entry." "First, from 2015 through November 2016, KidKraft threatened to cut off OJ[] [Commerce] unless Naomi Home stopped producing any additional products that competed with KidKraft." "Second, after the November 2016 termination, KidKraft threatened to take action against third party sellers such as Costco if they sold the Naomi Home [wooden play kitchen]."

According to Naomi Home, the first set of "distinct actions" consists of a threat and coerced agreement in 2015 and a threat in 2016. Naomi Home asserts that Matan Wolfson, a KidKraft employee, threatened Weiss in 2015 "that KidKraft would cut off OJ[] [Commerce] from further KidKraft products unless OJ[] [Commerce] agreed to stop selling Naomi Home products." It asserts that, "[o]n the same call, . . . [i]t was agreed Naomi Home would cease the development and sale (via OJ[] [Commerce] or otherwise) of additional competing products and, in exchange, OJ[] [Commerce] would be permitted to continue reselling KidKraft products." And it asserts that, in November 2016, another KidKraft employee "told [Weiss that] OJ[] [Commerce] had to either stop

selling the Naomi Home kitchen altogether or lose its KidKraft business relationship completely."

Naomi Home has adduced sufficient evidence to create a genuine dispute about the 2015 and 2016 threats, but evidence of an agreement in 2015—for Naomi Home to limit production and cease innovation in exchange for continued KidKraft sales to OJ Commerce—is wanting. To be sure, Weiss initially testified that he and Wolfson "came to some sort of . . . understanding that [Naomi Home] w[ould] not be selling to retailers our product and not be producing . . . any new products that compete with KidKraft, and that would be sufficient to retain the relationship with KidKraft." But, when pressed for more details, Weiss testified that *he* proposed cutting back production of Naomi Home products and that Wolfson stated that he would "take [the proposal] up the chain and . . . let [Weiss] know." Weiss never "heard . . . back from [Wolfson]." Weiss did not "follow up with Mr. Wolfson about th[e] . . . proposal." A KidKraft account representative to whom Weiss reached out told Weiss that "it's not a concern." And, by Weiss's own account, "the situation went away."

The evidence also does not support the second alleged set of "distinct actions"—that KidKraft "threatened to take action against third party sellers such as Costco if they sold the Naomi Home [wooden play kitchen]." It is undisputed that Naomi Home "subpoenaed over 20 retailers and suppliers and asked them to produce evidence that KidKraft threatened to foreclose or foreclosed Naomi Home . . . from the market," but received no such evidence in

response. Instead, the head toy buyer for Costco testified that she was "not aware of KidKraft ever issuing any threat of any kind to Costco," and that, because of her position, she "would be aware of such a threat if one had been made." She also testified that, if Costco were to receive such a threat, "Costco . . . would not yield."

Naomi Home argues that a genuine dispute remains because a jury could infer an agreement between Costco and KidKraft from conversations Weiss and Drobnis had with Costco employees. Weiss "was told by . . . Drobnis that Shannon Lord told him that [Costco] couldn't buy the Naomi Home kitchen" because "the category was already filled." Drobnis "received the impression" from his conversation with Costco "that [Costco] did not want to carry a product that would directly compete with KidKraft and thereby upset the applecart." And Weiss maintains that, in a separate conversation, Lord told him "that [Costco] didn't want to jeopardize [its] relationship with KidKraft."

This evidence does not permit a reasonable inference that KidKraft used its monopoly power to coerce Costco into boycotting Naomi Home. To be sure, the Court must credit as true Weiss's testimony that a Costco buyer told him that Costco was afraid of souring its relationship with KidKraft. *See Washington*, 25 F.4th at 897. But, for Naomi Home's contention to be correct, one must draw the inference from Weiss's testimony that Costco's reluctance to buy resulted from acquiescence in a KidKraft threat. And that inference is not a reasonable one. Evidence of a threat to Costco or of Costco's acquiescence "did not surface during

discovery." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1055 (11th Cir. 2020). And, "[a]bsent any [such evidence], we are . . . left with [a] hypothesized account of [a] . . . meeting [between KidKraft and Costco.] [B]ut . . . speculation is not evidence." *See id.* Indeed, if KidKraft was in fact a monopolist in the market for wooden play kitchens, it would have been rational for Costco to fear upsetting KidKraft even without a threat. And it would have been lawful for Costco to decide unilaterally not to deal with Naomi Home on that basis. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998).

In antitrust disputes where conduct is as consistent with unlawful "concerted action" as it is with lawful "independent action," the plaintiff must present "evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763–64 (1984); *see also Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1583 (11th Cir. 1988) ("To infer conspiracy from terminations or refusals to deal would, in effect, deter or penalize perfectly legitimate conduct." (internal quotation marks omitted)). Naomi Home presented no such evidence. To the contrary, Naomi Home concedes "that Costco in February 2017 opted not to carry KidKraft's wooden kitchen" *or* Naomi Home's kitchen and instead chose "to carry a competitor's product."

b.  <u>Naomi Home Has Not Established Substantial Foreclosure.</u>

Naomi Home offers no evidence that KidKraft's 2015 and 2016 threats to OJ Commerce and its supposed threat to Costco

caused "competition [to] be[] foreclosed in a substantial share of the line of commerce affected." *McWane*, 783 F.3d at 835 (internal quotation marks omitted). Instead, Naomi Home cites *McWane, Inc. v. Federal Trade Commission*, 783 F.3d at 835, 837, for the propositions that "substantial foreclosure is not an essential element of a [section] 2 claim" and that "a lesser degree of foreclosure is required when the defendant is a monopolist." (Internal quotation marks omitted.) But *McWane* supports neither proposition.

*McWane* confirms that substantial foreclosure remains a necessary element of an exclusive-dealing theory of harm. We explained that, before 1961, "all that was required for an exclusive deal to violate the [antitrust laws] was proof of substantial foreclosure." *Id.* at 835. In *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961), the Supreme Court "continued to emphasize the importance of substantial foreclosure, but opened the door to a broader analysis." *McWane*, 783 F.3d at 835. Under that analysis, "'[s]ubstantial foreclosure' continues to be a requirement for exclusive dealing to run afoul of the antitrust statutes," "[b]ut foreclosure is usually no longer sufficient by itself." *Id.* at 835, 837. In other words, *Tampa Electric* and the decisions that followed made it *harder*, not easier, to establish a violation of the antitrust laws based on exclusive dealing.

Naomi Home also misconstrues the necessary degree of foreclosure. *McWane* did not hold, as Naomi Home implies, that something less than substantial foreclosure will suffice. Instead, this Court explained that, "[t]raditionally[,] a foreclosure

21-11521                Opinion of the Court                31

percentage of at least 40% has been a threshold for liability in exclusive dealing cases," although "some courts have found that a lesser degree of foreclosure is required when the defendant is a monopolist." *Id.* at 837 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (en banc)). In other words, "'substantial foreclosure' continues to be a requirement," *id.*, even though "courts have varied widely in the degree of foreclosure they consider [substantial]," *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) (internal quotation marks omitted). In *McWane*, for example, we concluded that foreclosure of "50–60% of [the] distribution [market]" was high enough to be substantial. *See McWane*, 783 F.3d at 837–38. And in *United States v. Microsoft Corp.*, the District of Columbia Circuit concluded that Microsoft had caused substantial foreclosure through "exclusive deals with fourteen of the top fifteen access providers in North America, which account[ed] for a large majority of all" providers of the relevant product. *See Microsoft*, 253 F.3d at 70–71 (alteration adopted) (internal quotation marks omitted). But even if we accept that some amount of foreclosure less than forty percent can count as substantial, Naomi Home does not explain what the threshold would be or why.

Nor does Naomi Home explain in its briefs how much of the market for wooden play kitchens was foreclosed by KidKraft's supposed threats to OJ Commerce and Costco. Indeed, given that OJ Commerce *rejected* KidKraft's request in 2016 not to stock Naomi Home kitchens, that threat could not have caused *any* foreclosure.

Similarly, it is undisputed that, after the 2015 threat, OJ Commerce continued selling both KidKraft and Naomi Home kitchens until November 2016. And Naomi Home has not pointed us to any substantive evidence establishing Costco's market share, a figure that could serve as a proxy for the degree of foreclosure caused by the supposed threat to Costco.

3.  KidKraft Has Not Forfeited Its Arguments in Support of Affirmance.

We briefly address OJ Commerce and Naomi Home's meritless contention that KidKraft forfeited many of the arguments it made in its appellate brief. They contend that KidKraft failed to argue before the district court that there was "no proof of agreement with [KidKraft] for [Naomi Home] to not bring additional products to market." But in response to OJ Commerce and Naomi Home's statement of material facts, KidKraft argued that "the cited evidence" did "not support[]" that "KidKraft entered into" Weiss's proposed agreement. Similarly, in a brief in support of its motion for summary judgment, KidKraft wrote that "Plaintiffs' own testimony is that KidKraft took no action in response to [Weiss's] offer."

OJ Commerce and Naomi Home also incorrectly assert that KidKraft raised for the first time on appeal its argument about the absence of evidence of harm to interbrand competition. But, in the district court, KidKraft argued that there was "no evidence that [its] termination of OJ[] [Commerce] caused the sort of constraint in market-wide supply or increase in price that would be required to

show an anticompetitive outcome." And KidKraft's economist made a similar argument in his expert report.

## C. *The State Law Claim Fails Because the Antitrust Claims Fail.*

The claim of tortious interference fails. OJ Commerce and Naomi Home concede that "their state law claim relies on their ability to succeed on their antitrust claim[s]." (Internal quotation marks omitted). Because the district court correctly entered summary judgment on the antitrust claims in favor of KidKraft and MidOcean, it follows that MidOcean was entitled to a summary judgment in its favor on the state-law claim.

## IV. CONCLUSION

The judgment in favor of KidKraft and MidOcean is **AFFIRMED**.